UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

SANDRA CARPENTER,                                                              PLAINTIFF,

v.                                          CASE NO. 10-2025

RHEEM MANUFACTURING COMPANY,                                    DEFENDANT.

## MEMORANDUM BRIEF IN SUPPORT
## OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Sandra Carpenter is a current employee of Defendant Rheem Manufacturing Company ("Rheem").  She claims she was discriminated against in her employment because of her age in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.*, and the Arkansas Civil Rights Act of 1993 ("ACRA"), Ark. Code Ann. §16-123-101, *et seq.* and because of her sex in violation of Title VII of the Civil Rights Act of 1964, § 2000e, *et seq.*, and ACRA.  Specifically, Carpenter claims she was subjected to disciplinary action and disqualified from her forklift driving job, and suffered a resulting reduction in pay, under circumstances in which similarly situated younger and/or male forklift drivers were treated more favorably.

In this Motion for Summary Judgment, Rheem asserts that undisputed facts show Carpenter was disciplined and disqualified from her forklift driving job for legitimate, non-discriminatory reasons, and that she has no evidence a similarly situated younger and/or male forklift driver was treated more favorably.  There is no genuine issue of material fact as to these issues and Rheem is entitled to judgment as a matter of law dismissing Carpenter's age and sex discrimination claims with prejudice because no reasonable jury could find Rheem unlawfully discriminated against her.

I.      __Facts.__

Rheem owns and operates a manufacturing plant in Fort Smith, Arkansas, ("the Plant") where it produces commercial and residential heating and air conditioning equipment and components (Ex. 2, ¶ 2).   The hourly production and maintenance employees in the Plant, including Carpenter, are represented by Local 7893 of the United Steelworkers Union and work under the terms of a collective bargaining agreement negotiated between Rheem and the union (Id.).

In October 1977, Rheem hired Carpenter as a Production Worker in the Plant (Ex. 1, p. 14).  Within a few years of being hired, she used the seniority-based job bidding system created by the collective bargaining agreement to bid for a Lift Truck Operator ("LTO")(i.e., forklift driver) position in the Plant's Shipping Department (Ex. 1, pp. 14-16).  Throughout most of her employment with Rheem, Carpenter generally remained an LTO in the Shipping Department, although she was occasionally temporarily reassigned to other areas in the plant as required by fluctuating production demands (Ex. 1, pp. 16-18).

Carpenter was trained in Rheem's general Plant Rules, Plant Safety Rules, and Forklift Safety Rules.   In July 2000, she participated in a training course for LTOs during which she viewed a film concerning forklift safety, reviewed a list of "do's and don'ts," and took a written test (Ex. 1, p. 32, dep. ex. 2).  On October 3, 2003, she acknowledged receiving a copy of the general Plant Rules (Ex. 1, p. 33).  Those Plant Rules, of which Carpenter testified she was "well aware," were posted on bulletin boards around the Plant and they stated in part:

> Employees committing any of the following acts will be subject to disciplinary action, including discharge.

*      *      *

22.     Failure to obey safety rules.   (Be sure to become familiar with plant and departmental safety rules.)

(Ex. 1, p. 34, dep. ex. 5; Ex. 2, ¶ 4).   In addition to these generally-applicable Plant Rules, Rheem enforces written Safety Rules specific to the operation of forklifts in the Plant, and Carpenter acknowledged receiving and reading those forklift safety rules (Ex. 1, p. 34, dep. ex. 6; Ex. 2, ¶ 5).   In fact, by the time events that resulted in her disqualification began in August 2008, Carpenter had been driving a forklift in the Plant for approximately thirty years and she was well aware of Rheem's rules and her safety obligations while operating a forklift (Ex. 1, pp. 47-48).   Also, there was a fatality in the Plant in 2007 when an employee on foot darted into an aisle and was struck by a forklift, and that has made Plant management even more emphatic about the importance of forklift safety (Ex. 1, p. 99; Ex. 2, ¶ 6).   As Carpenter agreed, Plant management has maintained a strict policy requiring forklift drivers to comply with safety rules, and constant vigilance is necessary while operating a forklift on the crowded plant floor (Ex. 1, pp. 48-49, 99).

During the relevant time period (August 2008 to February 2009), Carpenter was immediately supervised on a day-to-day basis by first shift Shipping Department Supervisor Bryan Moore (erroneously identified as "Brian" Moore in the transcript of Carpenter's deposition) (Ex. 1, pp. 21-22; Ex. 3, ¶ 3).   Moore reported to General Foreman Scott Jewsbury who was responsible for overall management of the Shipping, Receiving, and Racks Departments (Ex. 1, p. 21; Ex. 3, ¶ 4).   Carpenter testified that although she had no problems with Moore, she had a "personality conflict" with Jewsbury that arose out of her propensity to question his instructions (Ex. 1, pp. 22-23, 31).   As discussed in more detail below, Carpenter's

3

allegations of discrimination are chiefly focused on Jewsbury even though there is no evidence he participated in the disciplinary decisions that led to her disqualification.

<u>Carpenter's August 29, 2008, Forklift Safety Violation</u>

Over the course of a six-month period between August 2008 and January 2009, Carpenter committed three forklift safety violations that resulted in Rheem's decision to disqualify her from driving a forklift on January 26, 2009.  The first violation occurred on August 29, 2008, while she was hauling finished air conditioning units from the production lines to the "leak check" area of the warehouse (where inspectors check each finished unit for refrigerant leaks prior to shipping) (Ex. 1, pp. 54-56).  Carpenter made between twenty-five and thirty such trips each day, stacking the finished units in rows (Ex. 1, pp. 55, 57).  During each trip, she passed twice – once in each direction – through so-called "Door No. 8" in the wall between the production floor where she collected the units and the warehouse area where she deposited them (Ex. 1, pp. 56-57).

As shown in the photograph of Door No. 8 that is exhibit 11 to Carpenter's deposition (showing the approach from the warehouse area to the production floor), an open aisle runs parallel to the wall on the production floor side of the door and crosses in front of the door to create an intersection that is a busy, high traffic area (Ex. 1, pp. 57, 59, dep. ex. 11).  As shown in the photograph, as Carpenter approached the door from the warehouse side, she could observe a sign over the door that stated "STOP Sound Horn Proceed Slowly" (<u>Id.</u>).  As Carpenter testified, that sign was over the door in 2008 (Ex. 1, pp. 34, 57-58, dep. ex. 6).  She testified at deposition that she was well aware Forklift Truck Safety Rule No. 8 required her to stop at this

intersection, sound her horn, and yield to vehicles traveling in front of her through the intersection on the crossing aisle (since she was making a right turn out of the door) (Id.).

Also, as shown in the photograph that is exhibit 12 to Carpenter's deposition, there is a convex safety mirror over the intersection that allows persons approaching it to indirectly observe persons or vehicles approaching the intersection from other directions (Ex. 1, pp. 58-59, dep. ex. 12).  This safety mirror was present over the intersection in 2008 (Id.).

On August 29, 2008, while she was returning from the leak check area to the production floor, Carpenter approached Door No. 8 in her forklift from the warehouse side (i.e., from the direction of the camera in exhibit 11 to Carpenter's deposition).   At the same time, her supervisor, Bryan Moore, was driving a motorized cart on the crossing aisle and approaching the intersection from Carpenter's left with the intent to pass straight through the intersection (Ex. 1, pp. 60-61; Ex. 3, ¶ 3).   Jerry Brown was riding with him (Ex. 5, ¶ 3).   Carpenter testified at deposition that she stopped at the intersection, sounded her forklift horn, and looked both ways prior to making a right turn onto the crossing aisle.   Nevertheless, she proceeded into the turn as Moore entered the intersection, forcing him to swerve abruptly to his left to avoid a collision with her forklift (Id.; Ex. 5, ¶ 3, 4).  It is undisputed that Carpenter turned in front of Moore, and if he had not swerved, there would have been a collision between their vehicles (Ex. 1, pp. 61-62).  Unlike Carpenter, Moore was not required to stop at this intersection and he had the right of way since he was proceeding straight (in which case the Forklift Truck Safety Rule No. 8 required him to slow, sound his horn, and proceed with caution, which he did) (Ex. 1, pp. 34, 60, 63, 65, dep. ex. 6; Ex. 3, ¶ 6).  This incident was no different from a situation on the public roads where a driver makes a right turn from a stop sign without yielding to traffic coming from the left, in which case it is presumptively the turning driver's fault for failing to yield.

Shortly after this incident, Moore went to the Plant's Human Resources Department to discuss appropriate disciplinary action against Carpenter with Labor Relations Manager Don Raines (Ex. 3, ¶ 7). They determined after reviewing the facts that Carpenter should be issued a written warning for violation of Plant Rule 22 (quoted above), which warns employees they can be disciplined for failure to obey safety rules (Ex. 1, p. 66, dep. ex. 13; Ex. 2, ¶ 8; Ex. 3, ¶ 7). In this instance, Carpenter had violated the Forklift Truck Safety Rules by driving in a reckless manner, as evidenced by the fact she had failed to observe Moore approaching the intersection from the left, failed to yield to him, and turned in front of him nearly causing a collision (Ex. 3, ¶ 7). Under Rheem's progressive discipline policy, disciplinary action for violation of a safety rule begins at the second, more serious written warning level rather than the less serious verbal warning level used for non-safety related violations (Ex. 2, ¶ 7, att. C; Ex. 3, ¶ 7). Scott Jewsbury, the Shipping Department General Foreman and Moore's supervisor, played no role in the decision to give Carpenter a written warning on August 29, 2008 (Ex. 2, ¶ 8; Ex. 3, ¶ 7). On September 4, 2008, Carpenter filed a grievance under the collective bargaining agreement asserting the company did not have just cause to give her a written warning (Ex. 2, ¶ 10).

<u>Carpenter's November 17, 2008, Forklift Safety Violation</u>

On November 17, 2008, Carpenter committed precisely the same safety violation in precisely the same spot as she had on August 29, 2008. This time she turned in front of Shipping Department Supervisor Steve Dake, who witnessed Carpenter's violation, as did Supervisors Cliff Thomas and Linda Dewitt who were standing nearby. As before, Carpenter was making a right turn out of the warehouse area through Door No. 8 to return to the production floor (Ex. 1, pp. 68-69). She testified she sounded her horn at the intersection, stopped, and looked left and

6

right (and in the overhead mirror) before proceeding (Ex. 1, p. 68). She observed Moore travel through the intersection from her left (as he had in August), and she waited for him to clear the intersection (Ex. 1, p. 69; Ex. 3, ¶ 8). She testified she again looked for oncoming traffic, did not see anything, and proceeded to turn right out of the door (Id.). However, Dake was following Moore in his own cart and entered the intersection just as Carpenter began her right turn, and he was forced to swerve to his left to avoid colliding with Carpenter's forklift (Id.; Ex. 3, ¶ 3). The 'rules of the road' for the intersection had not changed since August 2008 and Carpenter was required to yield to cross traffic moving through the intersection before turning (Ex. 1, pp. 67, 71, 74). Carpenter later apologized to Moore for failing to stop completely before turning, which strongly suggests awareness of her own culpability, as did the contemporaneous handwritten statement in which she wrote she told Dake she was sorry and she would "always stop – completely" (Ex. 1, pp. 75-76, dep. ex. 15).

After this second near-miss incident, Moore returned to Raines in the Human Resources Department and turned the matter over to him for handling since the potential disciplinary action in this instance was an unpaid suspension, which may be imposed only by the Human Resources Department (Ex. 2, ¶ 10; Ex. 3, ¶ 9). On December 1, 2008, Raines interviewed Carpenter regarding the incident, and she told him she had not looked left again after Moore passed through the intersection (contrary to her deposition testimony two years later) (Ex. 2, ¶ 11, att. D). He also took statements from Dake and two other supervisors in the area who had observed the incident, Cliff Thomas and Linda Dewitt (Ex. 2, ¶ 12, att. E, F, G). From this evidence, Raines concluded Carpenter was at fault for failing to look again for oncoming traffic and failing to yield to Dake (Ex. 2, ¶ 13). This was precisely the same safety violation for which she had received a written warning only three months before. Since this was Carpenter's second

7

violation of Plant Rule 22, Raines determined that the next step under the progressive discipline policy was a three-day unpaid suspension (Id.).  On December 1, 2008, Raines issued Carpenter a three-day suspension for a second violation of Plant Rule 22 (Ex. 1, p. 75, dep. ex. 14; Ex. 2, ¶ 13).  As before, Jewsbury was not involved in this decision to discipline Carpenter (Ex. 2, ¶ 14).  On December 2, 2008, she filed a grievance under the collective bargaining agreement contesting that the company had just cause to suspend her (Ex. 2, ¶ 16).

<u>Carpenter's January 20, 2009, Forklift Safety Violation</u>

Carpenter's third and final forklift safety violation occurred on January 20, 2009, and this time she actually struck another forklift.  The collision occurred in the leak check area of the warehouse where Carpenter and other forklift drivers were stacking finished units in rows, forming blind aisles between them (Ex. 1, p. 77).  She had deposited a unit and was exiting one of the aisles in her forklift when she collided with another forklift being driven by fellow LTO Randy Fulmer (Ex. 1, pp. 77-78).  Carpenter's deposition testimony concerning this incident (given nearly two years later) is somewhat inconsistent and difficult to parse.  At one point, she appears to testify she had backed out of the aisle, put the forklift into drive, but was stationary and preparing to move forward when Fulmer – who was backing out of an adjacent aisle – struck the front of her forklift and ran over her forks (Ex. 1, pp. 78-81).  This was not, however, what Carpenter told investigators at the time.  She wrote in a contemporaneous handwritten statement that *she* was "backing up" when the collision occurred (Ex. 1, pp. 81-82, 88-89, dep. ex. 16).  During the contemporaneous investigation, she did not tell company investigators she was stationary, or that Fulmer was moving and had struck her (Id.).  As Carpenter conceded, Plant

management could have concluded from her contemporaneous statements that she was moving when she struck Fulmer and thus at least shared in the fault (Ex. 1, pp. 82-83).

Moore again brought the matter to Raines to determine appropriate disciplinary action (Ex. 2, ¶ 16; Ex. 3, ¶ 10).  Under the progressive discipline policy, the next disciplinary step was termination (Ex. 2, ¶ 16).  Raines interviewed Carpenter on January 26, 2009, and took statements from Carpenter and Fulmer (Ex. 2, ¶ 17, 18, att. H, I, J).  Raines and Employee Relations Manager Jim Fesperman reviewed the evidence and discussed Carpenter's situation with Plant Manager Doyle Thresher (who must approve all terminations).  They agreed they did not want to terminate Carpenter's long-term employment despite the requirements of the progressive discipline policy (Ex. 2, ¶ 19; Ex. 4, ¶ 3).  They decided instead to propose to Carpenter and the union an agreement under which Rheem would only disqualify her from driving a forklift (in lieu of terminating her) and Carpenter and the union would agree to withdraw the pending grievances contesting her August 2008 written warning and her November 2008 suspension and they would not file a grievance contesting her LTO disqualification (Ex. 2, ¶ 19; Ex. 4, ¶ 3).  Once again, there is no evidence Jewsbury had any involvement whatsoever in those decisions, which were made collectively by Raines, Fesperman, and Thresher (Ex. 2, ¶ 20; Ex. 4, ¶ 4).

Fesperman relayed the disqualification offer to Union Steward and Grievance Committeeman Rocky Titsworth (Ex. 4, ¶ 5).  Titsworth discussed it with Carpenter, who agreed, and Titsworth told Fesperman that Carpenter and the union would accept the offer (Ex. 1, pp. 83, 86; Ex. 4, ¶ 5).  On the basis of this agreement, Carpenter's employment was not terminated but her Rheem-issued forklift license was revoked and she was disqualified from driving a forklift in the Plant (Ex. 4, ¶ 6).  She was subsequently transferred to a first shift

Production Worker position in Department 784 where she was assigned to work on a production line (Ex. 4, ¶ 6). As a result of this transfer, Carpenter's hourly wage was reduced by 23¢ per hour because the collective bargaining agreement mandates a higher wage rate for LTOs than for Production Workers, regardless of seniority (Ex. 4, ¶ 7). Carpenter subsequently used the job bidding system to transfer voluntarily to the Coil Fabrication Department where she remains currently employed as a Production Worker (Ex. 4, ¶ 8).

## II.   Carpenter cannot make a prima facie case of age or sex discrimination.

At her deposition, Carpenter did not allege that any decision-maker involved in her discipline and disqualification (i.e., Moore, Raines, Fesperman, and Thresher) made any statement that might constitute direct evidence of an unlawful intent to discriminate against her.[1] Carpenter must therefore rely on circumstantial evidence to prove that one or more of those four individuals harbored a discriminatory motive. To determine whether Carpenter has produced circumstantial evidence sufficient for a reasonable jury to find such a motive, the Court must apply the standard McDonnell-Douglas burden-shifting analysis.

### A.   Carpenter cannot make a prima facie case of age discrimination.

To establish a prima facie case of age discrimination under the McDonnell-Douglas analysis, Carpenter must produce evidence of the following:

(1)   she was over forty years of age;

(2)   she was qualified for her job;

---

[1] Carpenter did allege that Shipping Department General Foreman Scott Jewsbury had made in earlier years several (ambiguous) remarks suggesting discriminatory intent, but there is no evidence he participated in any of the decisions to discipline or disqualify Carpenter.

10

(3)     she suffered an adverse employment action; and

(4)     a similarly situated employee outside the protected class (or substantially younger than her) was treated more favorably.

Anderson v. Durham D&M, LLC, 606 F.3d 513, 523 (8th Cir. 2010).  For the purposes of argument, Rheem will posit that Carpenter can produce evidence to support the first three elements of this prima facie case.[2]  She was 56 years old when she was disqualified in January 2009; she had a Rheem-issued LTO License that qualified her to perform the LTO position; and her disqualification was an adverse employment action because she suffered a reduction in pay of 23¢ per hour when she was involuntarily transferred from the LTO classification to the Production Worker classification.

However, Rheem denies Carpenter has evidence showing any similarly situated employee under forty (or substantially younger than her) was treated more favorably.  Indeed, Carpenter testified at deposition that she was not aware of any younger employee in the Fort Smith plant who had been treated more favorably:

Q.     Are you aware of any persons that are younger than you are that have been treated differently because they are younger as it relates to the application of safety rules?

A.     No.

(Ex. 1, pp. 98-99).  Further, the two employees who bid into available LTO positions in the Shipping Department subsequent to Carpenter's disqualification were Brad Floyd, age 47, and Roger Adams, age 50 (Ex. 2, ¶ 21).  Even assuming one of those two individuals directly replaced her, both of them were within the protected age group and neither was substantially younger than Carpenter.  Furthermore, on February 12, 2009, around the time Carpenter was

---

[2]  Although her forklift safety violations in late 2008 certainly raises a question as to whether she continued to be qualified for the LTO job.

disqualified, Rheem terminated LTO Jimmy Jameson, age 43, for committing three forklift safety violations, the same offense for which Carpenter was only disqualified; therefore, Carpenter was actually treated more favorably than a similarly situated younger forklift driver (Ex. 2, ¶ 22).  She therefore cannot make a prima facie case of age discrimination and that claim should be dismissed as a matter of law.

      B.      <u>Carpenter cannot make a prima facie case of sex discrimination.</u>

To establish a prima facie circumstantial case of sex discrimination, Carpenter must produce evidence of the following:

      (1)      she is a member of a protected class;

      (2)      she was qualified for her job;

      (3)      she suffered an adverse employment action; and

      (4)      the circumstances give rise to an inference of gender discrimination.

<u>Norman v. Union Pacific R.R. Co.</u>, 606 F.3d 455, 460-461 (8th Cir. 2010).  Again, for the purposes of argument, Rheem will posit she can produce evidence establishing the first three elements of this prima facie case (although, again, her safety violations made her continued qualification for the LTO job dubious).  However, Rheem contends she cannot complete a prima facie case of sex discrimination because she cannot produce evidence sufficient to create a reasonable inference of discrimination.

This is for two reasons, both of which will be addressed in detail below (in the context of Rheem's argument that Carpenter has no evidence discrediting its legitimate, non-discriminatory reason for her disqualification).  First, Carpenter's deposition testimony specifically exonerates two of the key decision-makers in her disqualification (Moore and Raines).  Concerning the

other two decision-makers (Fesperman and Thresher), she makes no specific allegation they harbored discriminatory animus, but only makes the unavailing suggestion that the "manner" in which she was disqualified suggested some amorphous intent to discriminate.  Second, she has no evidence whatsoever that any similarly situated male LTO in the Fort Smith plant was treated more favorably.  To the contrary, the undisputed evidence shows that Carpenter herself was treated more favorably than a male LTO who was terminated after accumulating three forklift safety violations.  For these two reasons – argued in detail below and not repeated here for reasons of brevity – Carpenter cannot make a prima facie case of sex discrimination and that claim should be dismissed as a matter of law.

### III.    Rheem disciplined and disqualified Carpenter for legitimate, non-discriminatory reasons.

Even assuming for purposes of argument that Carpenter can make prima facie cases of age and sex discrimination, Rheem had legitimate, non-discriminatory reasons for disciplining her and disqualifying her from driving a forklift.  Specifically, the undisputed evidence shows she committed three successive violations of Plant Rule 22 (prohibiting violation of safety rules) by operating her forklift in a manner that reasonably appeared unsafe and in violation of Forklift Truck Safety Rules of which Carpenter was well-aware through training and long experience as an LTO in the Fort Smith Plant.

<u>Legitimate Reasons for the Written Warning</u>

First, it is undisputed that on August 29, 2008, Carpenter turned her forklift out of Door No. 8 into the path of her supervisor, Bryan Moore, who had the right of way (Ex. 1, pp. 60-63).

Because Carpenter was turning at the intersection, the Forklift Truck Safety Rules required her to stop at the doorway, sound her horn, and ensure the way was clear before turning, which she did not do (Ex. 2, ¶ 5. att. B).  Further reinforcing the safety rules was a sign posted over the door and facing the warehouse area from which Carpenter approached in intersection instructing drivers to stop, sound their vehicle's horn, and proceed slowly.  Carpenter claims she did stop in the doorway, but it is undisputed she pulled out in front of Moore and undisputed he had to swerve his cart to avoid a collision with her forklift, from which it could be reasonably concluded that even if she did stop she did not ensure the way was clear before proceeding (Ex. 3, ¶ 6; Ex. 5, ¶ 3, 4).  Just as the presumption of fault would fall on the turning driver if the same events had occurred on the public roads, the presumption of fault fell on Carpenter, especially where her own supervisor had observed her pulling out in front of him (as did another employee, Jerry Brown).  Carpenter argues she was overworked at the time and driving as safely as she could in the circumstances, but that is no excuse for failing to observe important safety rules and certainly no basis for finding the disciplinary action taken against her for this incident was in any way improper or illegitimate.  Moore and Raines reasonably determined Carpenter had violated Plant Rule 22, and she was legitimately given a written warning as the first step in the plant's progressive discipline policy.

### Legitimate Reasons for the Three-Day Suspension

Then, on November 17, 2008, Carpenter committed precisely the same offense in the precisely the same location, pulling her forklift out of Door No. 8 to make a right turn in front of supervisor Steve Dake (Ex. 1, pp. 68-76).   Again, the basic facts establishing fault are undisputed.  Dake, who was approaching the intersection from the left, had the right of way, and

Carpenter was required to yield to him before turning (Ex. 3, ¶ 8). But despite her claim she looked left before turning, she turned in front of Dake and forced him to swerve to avoid a collision with her forklift. This incident was witnessed by four supervisors. As before, she was presumptively at fault because she was required to yield to oncoming cross traffic but plainly failed to do so. Carpenter again argues she was overworked and hurrying but that does not make the conclusion she was at fault unreasonable, nor does it make the subsequent disciplinary action illegitimate. Moore and Raines reasonably determined she had violated Plant Rule 22 a second time and she had done so in precisely the same manner for which she had been disciplined on August 29, 2008. She was given a three-day suspension as the next step in the plant's progressive discipline policy.

<u>Legitimate Reasons for the Disqualification</u>

Finally, Carpenter struck another forklift on January 20, 2009. When subsequently interviewed by Raines, and in her contemporaneous written statement, Carpenter could not quite decide whether she had been moving forward or backing up when the collision occurred; nevertheless, Raines reasonably concluded that in either case her forklift was moving and she had not paid sufficient attention to her path of travel (Ex. 1, pp. 82-83, 88-89, dep. ex. 16; Ex. 2, ¶ 17). Therefore, despite Carpenter's insistence at her deposition – nearly two years later – that she was stationary and the other driver had struck her, Rheem possessed a reasonable basis at the time for concluding she was at least partially at fault in the collision. Since Carpenter had yet again violated the same plant rule for which she had previously received a written warning and a three-day suspension, she was subject to immediate termination under the progressive discipline policy (Ex. 2, ¶ 16). Raines and Fesperman took the matter to Plant Manager Doyle Thresher

15

and in lieu of terminating Carpenter's employment they collectively agreed they would only disqualify her from driving a forklift in recognition of her long service if she and the union agreed to withdraw her pending grievances over the prior disciplinary action and not contest the disqualification (Ex. 2, ¶ 19; Ex. 4, ¶ 3).  Carpenter and the union accepted this offer and she remains employed in the Plant as a Production Worker (Ex. 4, ¶ 5-8).

Rheem has thus produced more than sufficient evidence that it had legitimate, non-discriminatory reasons for disciplining and disqualifying Carpenter.  Indeed, it had a legitimate reason for terminating her employment, but it chose instead to treat a long-term employee more sympathetically than written policy might otherwise allow.  Therefore, the burden shifts to Carpenter to produce evidence from which a reasonable jury could find that Rheem's stated reasons for her disqualification are actually pretext to conceal an intent to discriminate against her because of her age and/or sex.   As argued in the next section, Carpenter cannot carry that burden.

**IV.**   **Carpenter has no evidence from which a reasonable jury could find that Rheem's legitimate reasons for her discipline and disqualification were pretext to conceal an unlawful discriminatory motive.**

Judging from her deposition testimony, Carpenter's discrimination claims rest on two basic allegations.  First, she alleges that Scott Jewsbury, the General Foreman over the Shipping Department, displayed animus against her as a woman on several occasions and made remarks to her that she interpreted as sexual advances.  Second, she alleges Rheem did not take equivalent disciplinary action against similarly situated younger and male forklift drivers who committed the same or similar offenses.

16

Rheem will argue in this section that there is no evidence Jewsbury participated in any of the decisions to discipline and disqualify Carpenter, and therefore the conduct she attributes to him is irrelevant to her discrimination claims.  Also, Carpenter specifically exonerates the managers whom the evidence conclusively shows *did* participate in the decisions to discipline and disqualify her.  Finally, she has no evidence any specific similarly situated younger or male forklift driver was treated more favorably than she was.  For these reasons, she cannot produce sufficient evidence from which a reasonable jury could find that Rheem's stated reasons for her discipline and disqualification were actually pretext to conceal a discriminatory motive.

A.      Jewsbury did not participate in any of the 2008 and 2009 decisions to discipline Carpenter, and she testified that the managers who were the decision-makers harbored no discriminatory animus.

Carpenter's direct supervisor in the Shipping Department was Bryan Moore, who was immediately responsible for directing her work on a day-to-day basis and for taking any formal or informal disciplinary measures necessary to ensure she performed her work in a satisfactory manner and in compliance with all Plant Rules and Safety Rules (Ex. 3, ¶ 3-4).  Jewsbury (to whom Moore reported) exercised responsibility for general management over the Shipping, Receiving, and Racks Departments, and although he was indirectly responsible for Carpenter's work and safety performance as an employee in the Shipping Department, that was not the primary focus of his day-to-day responsibilities (Id.).  Rather, that was Moore's job, and he was fully empowered to initiate whatever disciplinary action he believed necessary and appropriate without Jewsbury's approval (Id.).  As a matter of practice, however, Moore takes proposed disciplinary action to the Plant's Human Resources Department for consultation before making a

final decision (and disciplinary decisions are not his to make where the prescribed penalty is suspension or termination)  (Ex. 2, ¶¶ 10, 16; Ex. 3, ¶ 5).

In each of the three incidents that ultimately culminated in Carpenter's January 2009 disqualification, it was Moore who initiated the disciplinary process, and he did not discuss any of the incidents with Jewsbury prior to taking them to the Human Resources Department for discussion and decision (Ex. 3, ¶¶ 7, 9, 10).  For the August 29, 2008, incident, it was Moore and Raines who made the final decision to give Carpenter a written warning, and for the November 17, 2008, incident, it was Raines who made the decision to impose a three-day suspension (Ex. 2, ¶¶ 8, 13; Ex. 3, ¶¶ 7, 9).  Jewsbury's input was neither sought nor received in either instance (Id.).  And when Carpenter struck another forklift on January 20, 2009, Moore handed the matter over to Raines and Fesperman in the Human Resources Department for handling and decision since Carpenter was facing termination for a third violation of Plant Rule 22 (Ex. 2, ¶ 16; Ex. 3, ¶ 10).  Raines and Fesperman both deny they consulted Jewsbury, and there is no evidence Jewsbury otherwise participated in their decision to disqualify Carpenter (Ex. 2, ¶ 20; Ex. 3, ¶ 10; Ex. 4, ¶ 4).

Given this undisputed evidence, Carpenter testified herself out of her own claims when she specifically absolved the decision-makers of discriminatory animus and focused her allegations exclusively on Jewsbury's alleged motives and conduct unrelated to the disciplinary action at issue.  Regarding Moore (who was 46 years old at the time), she testified he harbored no prohibited animus:

> Q.      Did you ever have any problems with Mr. Moore?
>
> A.      Not really.  A few times he would just say I want you on your job, on your line when the buzzer goes off.  I said, yes, sir.  It's right there.  I got my coffee.  I see

> my line.  Just minor stuff like that.  It wasn't nothing that I thought I had to grieve about.
>
> Q.    Did you think Mr. Moore in any way treated you differently because you're a woman?
>
> A.    No.

(Ex. 1, p. 31; Ex. 3, ¶ 12).  Carpenter testified similarly regarding Raines (who was 45 years old at the time):

> Q.    I take it you dealt with Mr. Raines, who is present at your deposition in this matter?
>
> A.    Yes, sir.
>
> Q.    And it was his decision, based upon the recommendation of the safety committee, that you, in effect, had had your third safety violation?
>
> A.    Yes, sir.
>
> Q.    Do you know of any reason why Mr. Raines would come to the determination that some discipline was appropriate because of what occurred here based upon the fact you're a woman?  Any reason to believe that he discriminates against women?  Do you have any information that would lead you to believe that?
>
> A.    No, sir.

(Ex. 1, p. 85; Ex. 2, ¶ 24).  Based on this testimony, no reasonable jury could find that the actions or decisions of Moore and Raines – which figured very prominently in the disciplinary action against Carpenter – were motivated by discriminatory intent or animus.

As for Fesperman (and Thresher by extension), Carpenter testified that the only evidence suggesting they may have harbored discriminatory animus was the "way" they handled her disqualification:

> Q.    Okay.  Do you know Mr. Fesperman?
>
> A.    Yes, sir.

19

Q.      He was involved as well?

A.      Yes.

Q.      He dealt with the union, I believe, and they arranged to, in lieu of terminating you, taking your forklift license away as a disciplinary alternative?   He was involved in that?

A.      Yes.

Q.      Do you know any reason why you would think Mr. Fesperman has – harbors any animus against women or discriminates against women?

A.      No, just for the fact the way they did it.  They said if I pulled my grievance against Mr. Jewsbury on one of the write-ups, you know – this is what I was told. If it was – if I pulled one – they were going to fire me right there on the spot, but if I pulled one of my grievances on Mr. Jewsbury for writing me up for those safety violations,[3] they would keep me hired and put me back on the line – I mean, put me in the department, but I'd be a production worker.  If not, I would be fired right then directly on the spot.

(Ex. 1, pp. 85-86).  This is not evidence of discriminatory intent.  First, as mentioned, Carpenter offers no evidence or reason to believe it was Jewsbury who was responsible for the disciplinary actions that led to her disqualification.  And in fact, he was not, as discussed above.  Second, Carpenter offers no evidence or reason to believe that Rheem's request she drop her union grievances in exchange for a reduced penalty was motivated by anything other than sympathy for a long-term employee and a legitimate desire to settle and extinguish pending and threatened union grievances the company would otherwise expend time and resources to administer.  Third, Fesperman (who was 57 years old at the time) and Thresher (who was 60) were both her age-contemporaries, further weakening her claim that her age was a factor in their decisions (Ex. 2, ¶ 24; Ex. 4, ¶ 10).  There is no evidence whatsoever from which a reasonable jury could find that

---

[3]  As discussed above, there is no evidence Jewsbury had any involvement in the disciplinary action taken against Carpenter for her safety violations in 2008, and therefore her union grievances were not "against Mr. Jewsbury."

Rheem's offer to reduce Carpenter's penalty in exchange for the withdrawal of her union grievances was motivated by discriminatory animus or that it had any unlawful discriminatory effect on her.[4]

Having absolved Moore, Raines, Fesperman, and Thresher of harboring discriminatory animus (and having thus exonerated all the undisputed decision-makers), Carpenter focuses her attack exclusively on Jewsbury.  She alleges she had a "personality conflict" with him and that his conduct on several earlier occasions unrelated to her 2008 and 2009 disciplinary action led her to believe he was deliberately discriminating against her.  Specifically, Jewsbury allegedly engaged in the following conduct:

(1)     He "singled her out" by telling her to go to work when he saw her idling, but she did not hear him similarly admonish idling male employees (Ex. 1, pp. 24-30).

(2)     He was "abrupt" with her to a greater degree than he was with her male co-workers (Ex. 1, p. 31).

(3)     On one occasion, he approached her on the plant floor to apologize for "miscommunicating" with her and suggested they "get together and talk someday," which Carpenter interpreted as sexually harassing (Ex. 1, pp. 38-39).

(4)     Sometime after attempting the latter apology to Carpenter, Jewsbury approached her again while she was sitting on her forklift, put his foot on the lift, leaned close to her, and asked, "[I]s everything okay between us," which Carpenter again interpreted as a "sexual advance" (Ex. 1, pp. 43-44).

---

[4]   In any event, Rheem and the union ended up disputing the terms of this agreement.  While Carpenter and the union did withdraw the two existing grievances concerning the August and November 2008 disciplinary actions, they filed a still-pending and disputed grievance concerning her disqualification (Ex. 1, pp. 86-87; Ex. 4, ¶ 9).

(5)     On one occasion in 2003 or 2004, after Carpenter had purchased a new car, Jewsbury said to her as she walked to her car in the parking lot, "I heard you made a pretty hood ornament," which Carpenter apparently interpreted as sexual (Ex. 1, pp. 41-42).

None of these allegations involved disciplinary action against Carpenter, nor did they pertain to any of the forklift safety violations she committed in 2008 or 2009 and which led to her progressive discipline and disqualification.  This is no more than a collection of random complaints about Jewsbury's conduct over a period of several years, some of which (such as the attempted conciliatory gestures) would require a reasonable jury to ignore the obvious interpretation to reach Carpenter's nefarious one.   In any event, she offers no evidence establishing any connection between Jewsbury and the disciplinary actions that resulted in her disqualification.   Therefore, Carpenter's complaints about Jewsbury are no more than a red herring and should be disregarded by the Court in considering whether she has sufficient evidence to rebut Rheem's legitimate, non-discriminatory reasons for her disqualification.

It is possible Carpenter believes these incidents support a sexual harassment claim against Rheem based on Jewsbury's alleged conduct, but that is unavailing for two reasons.  First, she does not plead a cause of action for sexual harassment in her Complaint, only causes of action for age and sex discrimination.  Therefore, she has no sexual harassment claim to support.  Second, even assuming she has brought a sexual harassment claim, this handful of mostly ambiguous incidents was not "sufficiently severe or pervasive as to affect a term, condition, or privilege of [her] employment by creating an objectively hostile or abusive working environment."   Alvarez v. Des Moines Bolt Supply, Inc., 262 F.3d 410, 421 (8th Cir. 2010)(sexually-oriented remarks and occasional touching were not sufficient to create a sexually

hostile work environment); *see also*, <u>Cross v. Prairie Meadows Racetrack and Casino, Inc.</u>, 615 F.3d 977 (8th Cir. 2010)(plaintiff did not make a submissible case of sexual harassment where she alleged a co-worker touched her breast, pulled her ponytail, aggressively pursued her, and told another employee she had performed oral sex on him); <u>Vajdl v. Mesabi Academy of Kidspeace, Inc.</u>, 484 F.3d 546 (8th Cir. 2007)(plaintiff did not make a submissible case of sexual harassment where she alleged a co-worker constantly and overtly pursued her over a three month period, made comments about her body, touched her, asked her on dates, and called her at home). Even assuming Jewsbury engaged in all the conduct described by Carpenter at her deposition (as listed above), that would not be sufficient to support a sexual harassment claim as a matter of law. Further, she never made any complaint to the Human Resources Department that Jewsbury had sexually harassed her despite have received workplace training from Rheem in the company sexual harassment policy and reporting procedures (Ex. 1, pp. 34-37, dep. ex. 7, 8; Ex. 2, ¶ 23). To the extent Carpenter may be found to have brought a cause of action for sexual harassment, it should be dismissed as a matter of law.

Turning back to Carpenter's age and sex discrimination claims, to prevail she must show the decision-makers involved in her discipline and disqualification were motivated by a prohibited animus. However, as argued above, she has no evidence from which a reasonable jury could find that was the case. In light of the undisputed facts, no reasonable jury could find that the legitimate, non-discriminatory reasons proffered by Rheem for Carpenter's discipline and disqualification were actually pretext to conceal an unlawful intent to discriminate against her because her of age or sex.

B.      Carpenter has no evidence from which a reasonable jury could find that any similarly situated younger or male LTO was treated more favorably.

Since Carpenter has no evidence (nor any belief) that the managers who disciplined and disqualified her actually harbored prohibited discriminatory animus, her sole remaining mode of circumstantial proof of discrimination is evidence showing a similarly situated younger or male employee was treated more favorably than she was.  The test for determining whether another employee is similarly situated for this purpose is "rigorous" and "requires that the other employees be similarly situated in all relevant respects before the plaintiff can introduce evidence comparing herself to other employees."  Chism v. Curtner, 619 F.3d 979, 984 (8th Cir. 2010)(quoting Fields v. Shelter Mutual Ins. Co., 520 F.3d 859, 864 (8th Cir. 2008)).  Carpenter has no evidence any such similarly situated employee was treated more favorably.

At deposition, Carpenter specifically denied knowing of any other LTO in the Plant who had (like her) committed three safety violations while driving a forklift but was treated more favorably:

> Q.      But my point is:  You're not aware of anybody that hasn't been fired for having three safety violations?
>
> A.      No, sir.
>
> Q.      And you said that the company was strict about this rule?
>
> A.      Uh-huh, yes, sir.
>
> Q.      And you know that as a matter of your own knowledge?
>
> A.      Yes, sir.

(Ex. 1, p. 52).  Rheem is likewise unaware of any LTO in the Plant (other than Carpenter herself) who was not terminated after committing three safety violations while driving a forklift.  As Carpenter acknowledges, Plant management is strict about forklift safety, and that is partly the

24

result of an accidental fatality in the plant in 2007 when a forklift collided with a pedestrian who had darted into an aisle (Ex. 1, p. 99; Ex. 2, ¶ 7).  Since that time Plant management has placed a special emphasis on forklift safety (Id.).  There is no one – either younger or male – similarly situated to Carpenter who committed as many forklift safety violations as she did but was treated more favorably.

Ironically, it was Carpenter herself who was treated more favorably than another LTO with three forklift safety violations.  In an affidavit given to the National Labor Relations Board (where she originally filed her administrative complaint on February 9, 2009), Carpenter stated:

> I don't know of anyone who hasn't been fired if they get another safety violation after having been given a three-day layoff.  In fact, another employee, Jimmy [Jameson] got fired about 1 – 1 ½ weeks ago for having three safety violations.  He had been with the Employer for probably 20 years.  He had a three-day layoff for a safety violation about 6 – 12 months ago.  Then, he ran over a floor jack and got another safety violation.  Jimmy was fired because that was his third safety violation.  If you get another safety violation after getting a three-day layoff, the next step is to be fired.  The Employer is pretty strict about that.

(Ex. 1, pp. 50-52).  Rheem did terminate LTO Jimmy Jameson on February 12, 2009 (shortly after disqualifying Carpenter) for repeated violations of Plant Rule 22, the same rule Carpenter had violated (Ex. 2, ¶ 22).  Not only was Jameson a male LTO, but at age 43 he was also significantly younger than Carpenter (Id.).  Whereas Jameson was terminated, Carpenter was only disqualified for what was essentially the same offense, entirely belying any contention she was treated more harshly because of her age or sex.

Carpenter also testified at deposition that LTO Jeff Heckman was treated more favorably by Moore.  She alleges Heckman set off the collision alarm on his forklift on at least one occasion but Moore simply turned off the alarm with no consequence to Heckman (Ex. 1, pp. 90-92).  However, Carpenter conceded that Heckman was not involved in an accident or collision

but had set off the alarm in the normal course of loading trucks in the Shipping Department (Ex. 1, pp. 90-91). Therefore, as Carpenter ultimately conceded, her offenses and Heckman's alleged circumstances were not comparable (Ex. 1, p. 92). In fact, Heckman had not struck anything with his forklift nor had he violated any forklift safety rule; rather, he was doing his job normally and occasionally the dock plates over which he drove his forklift between the dock and the trailer he was loading caused the shock alarm on his forklift to sound, as Moore states in his attached affidavit (Ex. 1, p. 91-92; Ex. 3, ¶ 11). Carpenter, on the other hand, had two near-miss incidents in which she had failed to yield the right of way and a third incident in which she actually collided with another forklift under circumstances where it reasonably appeared she shared at least a portion of the fault. Her circumstances and Heckman's were not comparable, do not meet the "rigorous" standard for similar situation, and this allegation is not evidence Moore or anyone else treated her less favorably than a similarly situated younger or male LTO.

Carpenter is not aware of any other specific, similarly situated LTO whom she believes was treated more favorably than she was (Ex. 1, pp. 98). In fact, Jimmy Jameson (the only LTO she identifies as having accumulated three forklift safety violations) was treated *less* favorably than she was because he was terminated. Because Carpenter cannot show she was treated less favorably than a similarly situated significantly younger or male LTO, she has not produced evidence sufficient to rebut Rheem's showing it had legitimate, non-discriminatory reasons for disciplining and disqualifying her. Her age and sex discrimination claims therefore fail as a matter of law and should be dismissed.

## <u>CONCLUSION</u>

Carpenter cannot make prima cases of age or sex discrimination, and even assuming she could, she cannot rebut Rheem's legitimate reasons for disciplining and disqualifying her.  First, she can produce no evidence from which a reasonable finder of fact could conclude that the decision-makers in her disciplinary action and eventual LTO disqualification harbored unlawful discriminatory intent.  To the contrary, she explicitly exonerates the undisputed decision-makers of any such motive, and the manager she accuses of having an unlawful motive did not actually participate in the relevant decision-making.  Second, she has no evidence any similarly situated younger or male LTO was treated more favorably.  Again to the contrary, there is evidence Rheem treated Carpenter more favorably than a younger male LTO who was terminated at almost exactly the same time she was disqualified as an LTO and allowed to remain employed as a Production Worker.  There are no genuine issues of material fact and Rheem is entitled to judgment as a matter of law dismissing Carpenter's age and sex discrimination claims with prejudice.

Respectfully submitted,

RHEEM MANUFACTURING COMPANY,
Defendant

By:   /s/ Michael R. Jones____
Michael R. Jones
Christopher F. Woomer
GILKER & JONES, P.A.
9222 North Highway 71
Mountainburg, Arkansas   72946
Telephone:     (479) 369-4294
Facsimile:      (479) 369-2032
E-mail:         mrjoneslaw@aol.com

Attorneys for Rheem Manufacturing Company

CERTIFICATE OF SERVICE

I, Michael R. Jones, hereby certify that I have electronically filed the foregoing with the

Clerk of the Court on January 19, 2011, using the CM/ECF System, which will send notification

of such filing to the below named individual:.

Mark E. Ford
Pryor, Robertson, Beasley & Smith, PLLC
315 N. 7th Street
P.O. Drawer 848
Fort Smith, AR  72902-0848


By: /s/ Michael R. Jones
        Michael R. Jones